YANG SHAO
524 E 14TH AVE NAPERVILLE
IL 60563
shaoyang_suny@163.com
Defendant

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Yang Shao | Case Number： |
| Plaintiff, | |
| vs. | |
| Customers Bancorp, Inc.<br>Publicly traded holding company (NASDAQ: CUBI)<br>Address: 701 Reading Avenue, West Reading, PA 19611 | **Complaint For Fraud, Civil Conspiracy, Unjust Enrichment, Violation of Federal Lending and Notarial Laws, and for Declaratory and Injunctive Relief** |
| Customers Bank<br>Pennsylvania-chartered bank, wholly owned subsidiary of Customers Bancorp<br>Address: 701 Reading Avenue, West Reading, PA 19611 | **Jury Trial Demanded** |
| Jay Sidhu<br>Chairman of Customers Bancorp and Executive Chairman of Customers Bank<br>Address: 701 Reading Avenue, West Reading, PA 19611 | |
| Sam Sidhu<br>President and CEO of Customers Bank, Vice Chairman of Customers Bancorp<br>Address: 701 Reading Avenue, West Reading, PA 19611 | **JURY TRIAL DEMANDED** |
| Karl Danielian<br>Senior Vice President of Customers Bank, SBA National Sales Manager<br>Address: 40 General Warren Blvd, Malvern, PA 19355 | |
| Rosemary Dente<br>Vice President, SBA Servicing and Liquidation, Customers Bank<br>Address: Remote office, listed business address: 521 Park Avenue, Freehold, NJ 07728 | |
| Tamara R. Thompson<br>Illinois Notary Public, Owner of Tamara R. Thompson Consulting, LLC<br>Address: 718 W Vermont St, Villa Park, IL 60181 | |
| et al., | |
| Defendants | |

**COMPLAINT FOR FRAUD, CIVIL CONSPIRACY, UNJUST ENRICHMENT, VIOLATION OF FEDERAL LENDING AND NOTARIAL LAWS, AND FOR DECLARATORY AND INJUNCTIVE RELIEF JURY TRIAL DEMANDED**

COMES NOW the Plaintiff, Yang Shao, appearing pro se, and files this Complaint pursuant to Rule 1007 of the Pennsylvania Rules of Civil Procedure. In support thereof, Plaintiff avers as follows:

1. Background

1.1 This Complaint alleges the erroneous and fraudulent execution of the loan agreement and related documents.

1.2 This Complaint alleges the Defendant's role in facilitating the issuance of a loan based on forged signatures and misrepresentations of property ownership.

1.3 This Complaint seeks remedies for the financial and reputational harm Plaintiff has suffered as a direct result of Defendant's actions.

## 2. Facts and Reasons :

Plaintiff Yang Shao, who has at all times been the sole individual to fully purchase, with her own funds, the properties at issue in this case—AZ Property No. 1 (4839 E Charleston, Scottsdale, AZ) and AZ Property No. 2 (5328 E Anderson Dr, Scottsdale, AZ). On December 31, 2018, Plaintiff paid the full purchase price of $698,475.12 in cash to the previous owner, USS Team Investments III LLC, thereby obtaining the complete and exclusive ownership rights to AZ Property No. 1 and AZ Property No. 2.

As the genuine, rightful, sole, and 100% owner of AZ Property No. 1 and AZ Property No. 2, and with no other person or entity having ever contributed a single cent toward the purchase of these properties, no person or entity other than Plaintiff Yang Shao has any legitimate claim to being the rightful owner of AZ Property No. 1 and AZ Property No. 2, nor can anyone challenge Plaintiff Yang Shao's exclusive and lawful ownership of these properties.

Defendant, through fraudulent means, sought to recover a $3.05 million loan it had erroneously disbursed to Plaintiff's previous owner, USS Team Investments III LLC. These fraudulent actions included fabricating a real estate purchase agreement, a fraudulent loan agreement, a fraudulent Deed of Trust, a fraudulent guarantee agreement, forging Plaintiff's signature, fabricating real estate valuations, and deceiving the Small Business Administration (SBA). Despite there being no legitimate purchase agreement

involving Plaintiff or her company for the Arizona real estate at
$3.495 million, Defendant falsely claimed Plaintiff
had borrowed $3.05 million under her company's name to
purchase the Arizona real estate, instead of pursuing USS Team
Investments III LLC, which was the actual loan recipient.

On October 24, 2023, Defendant unlawfully forced the auction
Of AZ Property No. 1 and AZ Property No. 2, which Plaintiff had
fully purchased on December 31, 2018, with $698,475.12 in cash.
These actions resulted in the illegal seizure of Plaintiff's two
Arizona properties, leading to Defendant's unjust enrichment
amounting to $3.4921 million, significant financial harm to
Plaintiff, and severe damage to her mental health, exacerbating
her hereditary panic disorder.

Under Pennsylvania criminal law, Plaintiff Yang Shao, under
oath, declares that she has never participated in the fraudulent real
estate purchase agreement at the heart of this case, nor in the
resulting fraudulent loan agreement, Deed of Trust, or guarantee
agreement.

## 3. Legal Basis for Complaint

### 1). Fifth Amendment to the United States Constitution

The Fifth Amendment protects Plaintiff᾽s private property rights by ensuring that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Defendant᾽s actions unlawfully deprived Plaintiff of her property without due process and without any compensation.

### 2). Fourteenth Amendment to the United States Constitution

The Fourteenth Amendment extends the Fifth Amendment᾽s protections to state actions, ensuring that "no state shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. Defendant's actions, facilitated by the Title Company᾽s errors, violated these constitutional protections.

### 3). Pennsylvania State Constitution**

Pennsylvania's Constitution further safeguards private property rights and ensures that any deprivation of property follows strict legal procedures and compensatory measures.

### 4). Related Protections

The constitutional guarantees against unlawful seizures and the protections of private property in the Third Amendment indirectly

reinforce Plaintiff's rights to maintain exclusive ownership of her lawfully purchased properties.

### 4. Relief Sought

Therefore, Plaintiff files this complaint against Defendant, respectfully requesting that the Honorable Court:

**1).** Accept Plaintiff's complaint to protect her legal property rights over AZ Property No. 1 and AZ Property No. 2, which she fully purchased with her own funds.

**2).** Uphold the protections of the Constitution and impose penalties on Defendant for violating the constitutional rights of Plaintiff by unlawfully seizing her lawfully owned properties in Arizona.

### 5. Payer For Relief

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

**a.** Grant Plaintiff leave to file this Complaint to assert the claims set forth herein; and

**b.** Grant such other and further relief as the Court deems just and proper.

# PARTIES

**6. Defendants** ("Defendant" or "Customers Bancorp, Inc., and Customers Bank"), Pennsylvania corporations, are foreign entities that have not been duly organized or authorized to conduct business within the State of Arizona. as required under Arizona Revised Statutes (A.R.S.) § 10-1501, which mandates foreign corporations to obtain authority to transact business in the Arizona state.

**7.Jay S. Sidhu**, an individual and senior executive of Customers Bancorp;

**8.Sam Sidhu**, an individual and executive of Customers Bancorp;

**9**. **Karl Danielian**, an individual and Senior Vice President of Customers Bank;

10.**Rosemary Dente**, an individual and employee of Customers Bank;

11. **Tamara R. Thompson**, an individual notary public,

**12. Plaintiff Yang Shao** ("Plaintiff" or "Yang Shao") is a single immigrant and a foreign national who resides alternately between China and Illinois. Since purchasing AZ Properties: AZ Property No.1 and AZ Property No.2 from the seller, USS Team Investments III LLC, on December 31, 2018, Plaintiff Yang Shao has been the sole owner of AZ Property No.1 and AZ Property No.2.

**13. AZ Properties**: AZ Property No.1 , AZ Property No.2 and AZ Property No.3.

**1)**. **AZ Property No. 1**: The first house purchased by Plaintiff, located at 5328 East Anderson Drive, Scottsdale, Arizona 85254,  Lot Size is 10335 sq ft, and was built in 1997 (Tax Parcel No.215-11-399, lot 15).

**2)**. **AZ Property No. 2**: The Second house purchased by Plaintiff, located at 4839 East Charleston Avenue, Scottsdale, Arizona 85254 , Lot size is 8454 sq ft, and was built in 1998 ( Tax Parcel No.215-11-977, Lot 56 ).

**3). AZ Property No.  3**: The third house located at 17814 North 56th Street, Scottsdale, Arizona 85254,  Lot size is 9994 sq ft, and was built in 1991.  (Tax Parcel No. 215 - 11- 067, Lot 57). Plaintiff did not purchase **AZ Property No. 3**.

**14. USS Team Investments III LLC** ("USS Team"or "Seller") is an Arizona  limited liability company conducting business in Maricopa county. At all relevant times, was the seller of the  AZ Properties AZ Property No.1 and  AZ Property No.2 . On December 31, 2018, USS Team Investments III LLC sold  AZ Properties : AZ Property No.1 and AZ Property No.2 to Plaintiff Yang Shao.

**15. Endeavor 1 LLC and Endeavor AL LLC** were Plaintiff's Arizona limited liability companies.  Kyle Scott fraudulently copied, cut, and pasted Plaintiff Yang Shao's signatures from her prior land sale agreement dated August 3, 2017, and falsely designated his company, "Axcent," as the operating  manager  of  these  Plaintiffentities.  Using  this

fraudulent authority,  Kyle Scott colluded with the Defendant to falsify documents, misrepresenting Endeavor 1 LLC as the owner of the AZ Properties. He used Endeavor 1 LLC's name to secure a fraudulent $3.05 million loan from Defendant, with Endeavor AL

LLC and other entities or individuals acting as false guarantors for this sham loan. Additionally,  Kyle Scott privately opened bank accounts for Endeavor 1 LLC and Endeavor AL LLC, ensuring that only he and his wife were designated as the authorized signers on these accounts. The Plaintiff has never opened any bank accounts in Arizona for Endeavor 1 LLC or Endeavor AL LLC. Plaintiff is not a signer on the bank accounts opened by  Kyle Scott for Endeavor 1 LLC and Endeavor AL LLC in Arizona and had no knowledge of, nor any control over, the alleged monthly loan repayment transactions between these bank accounts and Defendant.

16. **Kyle Scott** is an individual who previously resided in Illinois and currently resides in Arizona. At all relevant times, Kyle Scott was and continues to be the manager of "Axcent" and "Endeavor US " .

17.**Maxime Scott** is an individual who previously resided in Illinois and currently resides in Arizona.

18. **Axcent LLC** ("Axcent") is a Florida limited liability company conducting business in Florida. At all relevant times,

Axcent was a foreign corporation not duly registered or authorized to conduct business within the State of Arizona , as required under Arizona Revised Statutes (A.R.S.) § 10-1501, which mandates foreign corporations to obtain authority to transact business in the Arizona state. At all relevant times, Kyle Scott was and continues to be the manager of "Axcent".

**19. Endeavor US LLC** ("Endeavor US ") is an Arizona limited liability company conducting business in Arizona. At all relevant times, Kyle Scott was and continues to be the manager of Endeavor US LLC.

**20. Adagio House II LLC, Adagio House III LLC, and Adagio House I & II PLC** ("Adagio II," "Adagio III," and "Adagio I & II," collectively "Adagios") are Arizona limited liability companies conducting business in Arizona. At all relevant times, the Adagios entered into a fraudulent purchase agreement with Kyle Scott's Endeavor US LLC to purchase the AZ Properties ( AZ Property No.1, AZ Property No. 2 and and AZ Property No.3) — three houses — for $3.495 million. Concurrently, they were the recipients of the Defendant's loan
disbursements.

**21. Richard Murray** is an individual residing in Arizona. At all relevant times, was and continus to be Kyle Scott's partner.

**22. Tod Decker** is an individual at all relevant times, was and continus to be Kyle Scott's partner.

**23. Alliant National Title Insurance Company** ( "Alliant Title" or " Title company" ), a Colorado limited liability company conducting business in Colorado. At all relevant times. Alliant Title was the title company responsible for handing the closing of the AZ Properties.

**24. Driggs Title Agency Company** ( "Driggs Agency" or "Title Agency" ), a limited liability company conducting business in Arizona. at all relevant times, Driggs Agency was the title agency company handing the closing of the AZ Properties.

## <u>VENUE</u>

**25**. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Among other things: a. Defendants Customers Bank and Customers Bancorp maintain their principal places of business in Pennsylvania, which is within this District; b. The loan at issue was issued and approved in Pennsylvania; and c. The planning, approval, and oversight of the transaction occurred at Defendants' headquarters in Pennsylvania.

## <u>DISCOVERY TIER</u>

*26. Pursuant to Rule 26.2(c)(3) of th*e Pennsylvania Rules of Civil Procedure, this case qualifies for assignment to Tier 3 by the court.

## <u>ALLEGATIONS COMMON TO ALL COUNTS</u>

### 27. Plaintiff Yang Shao is a Victim of Defendant's Financial

Plaintiff Yang Shao has been subjected to a series of deliberately orchestrated acts of financial fraud, identity theft, and document forgery by Defendants, with the intent to deceive, exploit, and generate unlawful profit. On October 24, 2023, Defendants unlawfully and forcibly auctioned AZ Property No. 1 and AZ Property No. 2—two residential properties that Plaintiff had purchased entirely with her life savings—without due process or lawful authority. As a direct result of Defendants' willful and malicious conduct, Plaintiff suffered not only substantial financial losses but also severe emotional distress, including psychological trauma exacerbated by her preexisting hereditary panic disorder.

  **(1).** Defendant initially relied on falsified Arizona real estate purchase agreements totaling $3.495 million (attached hereto as Exhibit "1" and Exhibit "2") without conducting proper due diligence. Subsequently, for its own financial benefit, Defendant employed forged documents, manipulated property appraisals, and fabricated Plaintiff's participation in fraudulent loan and guarantee agreements. These fraudulent acts were intended to deceive the Small Business Administration (SBA) and obtain approval for a $3.05 million loan and related guarantees.

  **(2). As a direct result of these fraudulent schemes, Defendant unjustly deprived Plaintiff of Arizona real estate ( AZ property No. 1 and AZ property No. 2)** valued at $2.2921 million and net profits of $1.2 million generated by those properties, resulting in unjust enrichment totaling $3.4921 million.

Furthermore, Defendant's actions caused significant financial harm and severe damage to Plaintiff's mental health, exacerbating her hereditary panic disorder.

**(3). Defendant's fraudulent conduct includes, but is not limited to:**

• **Relying on false $3.495 million Arizona real estate purchase agreements from the beginning :** Defendant relied on fraudulent Arizona real estate purchase agreements, such as those involving Adagio Houses as sellers—entities that were not the rightful owners of the Arizona Properties listed in the agreements. The fraudulent agreements were executed between Kyle Scott's company, Endeavor US LLC, and the fictitious entities, Adagio Houses. These agreements had no connection to Plaintiff Yang Shao or her companies, Endeavor 1 LLC and Endeavor AL LLC (attached hereto as **Exhibit "1" and "2").**

• **To generate profit, Defendant fabricated a Loan Commitment Letter:** Defendant fabricated a loan commitment letter to initiate the fraudulent scheme (attached hereto as **Exhibit "3").**

• **To generate profit, the Defendant fabricated loan agreements involving the Plaintiff's companies, Endeavor 1 LLC and Endeavor AL LLC, for a fictitious $3.05million loan.** It is well-established that real estate purchase agreements are the prerequisite and foundation for loan agreements. However, the Plaintiff's companies, Endeavor 1

LLC and Endeavor AL LLC, have never entered into any $3.495 million Arizona real estate purchase agreements with any individual or entity.

The Defendant's allegation that Endeavor 1 LLC and Endeavor AL LLC borrowed $3.05 million from the Defendant to purchase $3.495 million worth of Arizona real estate is entirely baseless, lacking any factual foundation or credible source (attached hereto as **Exhibits "1" and "2").**

Furthermore, the Defendant created fraudulent loan documents, including, but not limited to, a Note containing inconsistencies across multiple versions (attached hereto as **Exhibits "4"and"5"),** as confirmed by expert analyses (attached hereto as **Exhibits "8"– "10").**

• **To generate profit, Defendant created Fraudulent Guarantee Documents**. To generate profit, the Defendant created fraudulent guarantee documents. These include, but are not limited to, mortgage documents with inconsistencies across multiple versions (attached hereto as **Exhibits "6"and"7"**), as confirmed by expert analyses (attached hereto **as Exhibits "8"–"10"**).

• **To generate profit, the Defendant inflated the 2018 appraised value of the Arizona Properties to $3.09 million, despite their actual market value being under $1.5837 million.** The Defendant falsified these appraisals to secure SBA approval for a $3.05 million loan and related guarantees (attached hereto as **Exhibits "11" and "12"**). Defendant's overvaluation of the

Arizona Properties, falsely appraising them at $3.09 million in 2018 while their actual market value was less than $1.5837 million (attached hereto as **Exhibits "11," Pages 20/6a, 6b, 6c, and Exhibit "12")**, misrepresented their true worth and deceived the SBA into approving the loan.

• **To generate profit, the Defendant forged the Plaintiff's signature:** Defendant forged the Plaintiff's signature on the SBA 7(a) Borrower Information Form – Representations, Authorizations, and Certifications (attached hereto as Exhibit **"13," Page 2, and Page 6).**

Plaintiff's signature on **Exhibit "13," Page 2,** appears on the SBA 7(a) Borrower Information Form dated August 29, 2018. However, the same signature also appears on **Exhibit "13," Page 6**, which is a sales contract for a piece of land sold by the Plaintiff in Naperville, Illinois, dated July 3, 2017. These signatures on **Exhibit "13," Page 2 and Page 6**, are identical.

It is impossible for the Plaintiff to have signed the same signature on two entirely different documents, one dated July 3, 2017, and the other over a year later on August 29, 2018, as it is not feasible for a person to produce two identical signatures on separate occasions. The Plaintiff's signature on **Exhibit "13," Page 2**, was clearly copied from the Plaintiff's signature on **Exhibit "13," Page 6**, and was unlawfully copy, cut and pasted by Defendant onto the SBA 7(a) Borrower Information Form.

This forged signature on the SBA 7(a) Borrower Information Form dated August 29, 2018, was fabricated by the Defendant through illegal means to deceive the SBA and falsely implicate the Plaintiff as a guarantor for the fictitious $3.05 million loan (attached hereto as **Exhibit "13" Page 2, and Page 6).**

- **To generate Profit, Defendant Falsified Notarial Records**: The notarial records submitted to the court are falsified. Plaintiff, under penalty of perjury pursuant to Pennsylvania criminal law, affirms that prior to July 19, 2023, they had never met the notary in question nor had any interactions with them. The records lack a specific notarization time, and the stated notarization location, "**735 Executive Dr, Aurora, IL,**" does not exist. A Google Maps search for this address yielded no results, and Plaintiff personally drove along Executive Dr in Aurora, IL, but found no such location (attached hereto as **Exhibit "14").** Furthermore, multiple handwriting examinations confirmed that Plaintiff's signature on the notarial records was forged (attached hereto as **Exhibits "8"–"10").**

- **To generate profit, Defendant withheld Critical Information:** Defendant intentionally withheld critical documents and information, including but not limited to: the SBA Loan Authorization, loan-related details, guarantee-related details, and failed to disclose key discrepancies in the Closing documents. These discrepancies include contradictions in the identities of the buyer, seller, and loan applicant, among others (attached hereto as

**Exhibits "1", "2", "3", "4", "5", "6", "7", "11", "12", "13", "14", "15", "16", "17", "18", "19", "20", "21", "22"**).

**28.   Defendant  failed to perform its duty of due diligence by neglecting to verify the authenticity of the loan documents, the Deed of Trust, and guarantees.** Defendant neither confirmed the Plaintiff's identity nor obtained her explicit consent for the transactions in question. Furthermore, the Defendant did not inform the Plaintiff about the loans, guarantees, Deed of Trust, or mortgage-related matters until four years after the closing, on August 11, 2022, for the first time (attached hereto as **Exhibits "22"**).

**29.   Defendant's actions constitute gross negligence, fraud, and breach of fiduciary duty.** Defendant knowingly engaged in fraudulent activities, including relying on false purchase agreements, such as those involving the Adagio House entities as sellers, who were not the actual owners of the properties listed in the sales contracts (attached hereto as **Exhibits "1" and "2"**). This fraudulent purchase agreement was entirely unknown to Plaintiff Yang Shao and her companies, Endeavor 1 LLC and Endeavor AL LLC. Furthermore, neither Plaintiff Yang Shao nor her companies were involved in or consented to this purchase agreement. They had no connection whatsoever to the agreement or the fraudulent transactions arising from it.

**30.   Plaintiff has suffered substantial financial losses and emotional distress directly caused by Defendant's actions.**

Defendant has unjustly enriched itself by approximately $3.4921 million through unauthorized deductions and profits from the auction of the Plaintiff's Arizona Properties (**Arizona Property No. 1 and  Arizona Property  No. 2**).

• Unauthorized monthly deductions from the output of Plaintiff's Arizona Properties **(Arizona Property No. 1 and No. 2)**, totaling $1.2 million between 2018 and 2022.

• Illegally and forcibly auctioning Plaintiff's Arizona Properties **(Arizona Property No. 1 and No. 2)** in 2023, from which the Defendant improperly profited $2.2921 million.

• Irreparable harm to the Plaintiff's mental health, as well as personal and professional reputation, compounded by ongoing legal battles and foreclosure risks.

**31. The Plaintiff seeks compensatory and punitive damages, as well as any other relief the Court deems appropriate.** The Defendant's egregious conduct warrants severe penalties to deter similar fraudulent activities in the future.

**32. The Plaintiff requests the Court to order the judicial authorities to initiate a comprehensive investigation into the Defendant's past loan operations and auction of mortgaged properties, in order to protect vulnerable consumers who have had similar harmful experiences as the Plaintiff.**

# **Facts and reasons**

**33.** In December 2017, Plaintiff Yang Shao ("Plaintiff" or "Yang Shao") intended to reinvest $750,000 in proceeds from a prior land sale in Illinois through a Form Section 1031 Like-Kind Exchange, which was managed by Kyle Scott on July 3, 2017 (attached hereto as **Exhibit "23"**). As a result, Kyle Scott gained access to

Plaintiff Yang Shao's identification information, financial information, and signature (attached hereto as **Exhibit "23", Page 5**).

**34.** Due to the requirements of a Section 1031 Like-Kind Exchange"—which allows reinvestment only in real properties under the same seller's name—Plaintiff Yang Shao, having sold a real property under the Form Section 1031 Like-Kind Exchange"on July 3, 2017, was restricted to reinvesting in similar real properties and was prohibited from purchasing other types of businesses.

**35.** Given that the Plaintiff was a new immigrant with limited English proficiency, she subsequently continued to hire Kyle Scott to identify suitable real properties for reinvestment.

**36.** On December 15, 2017, Kyle Scott recommended twelve real estate projects for Plaintiff's initial consideration. From these options, Plaintiff narrowed her selection to the seventh deal including Arizona Properties three houses. On December 29, 2017, Kyle Scott sent a pricing proposal for the AZ Properties, AZ Property No. 1, AZ Property No. 2, and AZ

Property No. 3,   totaling $1M  for real properties and $2.7 M for business (attached hereto as **Exhibit "24"**).

37.   Kyle Scott explained to Plaintiff that, pursuant to the requirements of a Section 1031 Like-Kind Exchange—allowing reinvestment only in real properties of a like kind—Plaintiff, who had sold real property under the Form Section 1031 Like-Kind Exchange"on July 3, 2017, was restricted to reinvesting in similar real properties and was prohibited from purchasing other types of businesses. As a result, Kyle Scott advised Plaintiff to purchase the AZ Properties— AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3— for a total of $1 million for real properties (exclusively allocated to the real property portion (not for any business interests..., as prohibited under the Form Section 1031 Like-Kind Exchange).

Kyle Scott further assured Plaintiff that his business partner, Tod Decker, would purchase the business operations of the AZ Properties. After Plaintiff acquired the real property portion of the AZ Properties,  Tod Decker would lease the real properties from  Plaintiff at  market  value  and  continue  operating  the assisted living home. This arrangement would allow Plaintiff to earn stable rental income from leasing the AZ Properties to Tod Decker, ensuring minimal risk and consistent returns from Plaintiff's reinvestment (attached hereto as **Exhibit "24"**).

38. At the time of the proposed transaction in **2018**, the combined market median value for the three properties was less than $1,583,700 (attached hereto as **Exhibit "12"**). Since the Maricopa County official website only provides property assessments from the past five years, the closest available reference is the 2020 assessed values:

**1).** AZ Property No. 1: The first property purchased by Plaintiff, located at 5328 East Anderson Drive, Scottsdale, Arizona 85254, had a market value of $536,600 (attached hereto as **Exhibit "12"**).

**2).** AZ Property No. 2: The second property purchased by Plaintiff, located at 4839 East Charleston Avenue, Scottsdale, Arizona 85254, had a market value of $557,100 (attached hereto as **Exhibit "12"**).

**3).** AZ Property No. 3: The third property, located at 17814 North 56th Street, Scottsdale, Arizona 85254, which Plaintiff never purchased, had a market value of $490,000 (attached hereto as **Exhibit "12"**).

The combined 2020 assessed value of all three properties totals $1,583,700**, which** corroborates that the 2018 valuation should have been lower than this figure. **These values** directly contradict the Defendant's inflated $3.09 million appraisal**, which was used to** justify the SBA loan and guarantee approval**.**

**39.** However, because these three properties were nonconforming structures, purchasing them would necessitate substantial renovations to bring them into compliance with Phoenix City's Zoning Rules, requiring an additional expenditure of at least $500,000. Furthermore, in 2018, the United States was still recovering from an economic downturn, and one of the property owners was facing a renewed bankruptcy crisis, creating an urgent need for cash. As a result, the asking price for the three properties was 30% below the market median value and was quoted at $1 million.

**1).** Although the properties are zoned as R1-10, they are nonconforming structures under Maricopa County and Phoenix's zoning regulations for the following reasons:

(1). Lot Size Requirements:

• According to Maricopa County's Zoning Ordinance, R1-10 lots must have a minimum size of 10,000 square feet (attached hereto as **Exhibit "25"**).

• However, AZ Property No. 2, built in 1998, has a lot size of 8,454 square feet (attached hereto as **Exhibit "26"**) .

• Similarly, AZ Property No. 3, also built in 1998, has a lot size of 9,994 square feet (attached hereto as **Exhibit "26"**).

(2). Side Yard Requirements:

• Under Phoenix's Zoning Ordinance, side yards in R1-10 zoning districts must be at least 7 feet wide (attached hereto as **Exhibit "27"**).

• All three properties, however, have side yards measuring less than 7 feet (attached hereto as **Exhibit "28"**).

• These nonconformities were caused by renovations made by the seller, who constructed buildings exceeding the allowable size, resulting in noncompliant side yards.

Consequently, none of the three properties meet the requirements for R1-10 zoning. If Plaintiff were to purchase all three properties, extensive renovations would be required to bring them into compliance with Maricopa County's Zoning Rules, incurring additional costs of at least $500,000.

**2)** At the time, in 2018, the United States was still recovering from an economic crisis. The owner of AZ Property No. 1 and  The owner of AZ Property No. 2, Mrs. Miheala Micu, was facing a renewed bankruptcy crisis and urgently needed cash.

**(1).** Mrs. Mihaela Micu's Bankruptcy History and Subsequent Financial Transactions: Mrs. Mihaela Micu, the previous owner of AZ Property No. 1 and AZ Property No. 2, had previously filed for Chapter 11 bankruptcy protection on June 7, 2010, which was discharged on December 10, 2012 (attached hereto as **Exhibit "29")**. Six years later, in 2018, she faced another financial crisis, which compelled her to sell the AZ Properties—AZ Property No. 1 (4839 E Charleston, Scottsdale, AZ) and AZ Property No. 2 (5328 E Anderson Dr, Scottsdale, AZ) to Plaintiff Yang Shao for $668,475, which was two-thirds of the then-market price (attached hereto as **Exhibit "30")** through a Form Section 1031 Like-Kind Exchange"(attached hereto as **Exhibit "31").**

**(2).** Purchase Price and Terms:

**i.** The two properties, AZ Property No. 1 and AZ Property No. 2, were sold for $668,475.The Title Company overseeing the transaction was Alliant National Title Insurance Company, and the escrow number was No. 18-06-137056JM    ( attached hereto as **Exhibit "32"** ).

### A. AZ Property No. 1:

• Address: 5328 East Anderson Drive, Scottsdale, Arizona 85254 (Tax Parcel No. 215-11-399, Lot 15).

• Ownership History:
The property was owned by Mrs. Mihaela Micu, who acquired the title on September 1, 2016 (RN#: 20061169428 (attached hereto as **Exhibit "33"** ).

Mrs. Micu filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Arizona on May 27, 2010 (Case Number: 2:09-bk-29894 JMM, attached hereto as **Exhibit "29").**

She discharged her debts on December 11, 2012, and retained ownership of AZ Property No. 1 (attached hereto as **Exhibit "29"**).

• 2018 Financial Crisis:

Facing another financial crisis in 2018, Mrs. Micu sold AZ Property No. 1 to USS Team Investments III LLC on November 5, 2018 (attached hereto as **Exhibit "34"**).

• Subsequent Transactions:

On December 31, 2018, USS Team Investments III LLC sold AZ Property No. 1 together with AZ Property No. 2 to Plaintiff Yang Shao under a Section 1031 Like-Kind Exchange"
(attached hereto as **Exhibit "30"**and**"31" ).**

• The Title Company overseeing the transaction was Alliant National Title Insurance Company, and the escrow number was No. 18-06-137056JM (attached hereto as **Exhibit "32").**

**B. AZ Property No. 2:**

• Address: 4839 East Charleston Avenue, Scottsdale, Arizona 85254 (Tax Parcel No. 215-11-977, Lot 56).

• Ownership History:
The property was owned by USS Team Investments LLC. USS Team Investments LLC acquired the title to AZ Property No. 2 on December 30, 2013 (RN#: 20131093940) ( attached hereto as **Exhibit "35"**).

USS Team Investments LLC also owned by Mrs. Mihaela Micu (attached hereto as **Exhibit "36"**).

• 2018 Financial Crisis:

In 2018, facing a renewed financial crisis, Mrs. Micu's company USS Team Investments LLC sold AZ Property No. 2 to USS Team Investments III LLC on November 5, 2018 (attached hereto as **Exhibit "37"** ).

• Subsequent Transactions:

 On December 31, 2018 , USS Team Investments III LLC sold AZ Property No. 2 together with AZ Property No. 1 to Plaintiff Yang Shao under under a Form 1031 Exchange (attached hereto as **Exhibit "30"** and **"31" )**.

• The Title Company overseeing the transaction was Alliant National Title Insurance Company, and the escrow number was No. 18-06-137056JM (attached hereto as **Exhibit "32"**).

**ii.** The remaining $331,525 for AZ Property No. 3 ( 17814 N 56th Street Scottsdale AZ ) was financed directly by the seller under a rent-to-buy arrangement, bringing the total purchase price for all three properties to $1 million.

• Alternative Financing for AZ Property No. 3:

As a new immigrant without employment, Plaintiff did not qualify for a traditional loan. Therefore, the remaining $331,525 for AZ Property No. 3 was financed directly by the Seller under a rent-to-buy arrangements.

• Operational Agreement:

Plaintiff Yang Shao agreed to retain the Seller to continue managing the operations of the three assisted living facilities associated with the properties. The management agreement included an annual management fee of $100,000.

• The arrangement for AZ Property No. 3 further highlights the seller's financial distress and willingness to negotiate flexible payment terms.

In conclusion, these arrangements provided flexibility and made the purchase price even more favorable for Plaintiff.

**40.** Since the Plaintiff only had $750,000 in cash proceeds from a prior land sale and, as a new immigrant without employment, did not qualify for a traditional loan, she ultimately selected and purchased AZ Property No. 1 and AZ Property No. 2 for an all-cash price of $668,475.12 using a Form Section 1031 Like-Kind Exchange"(attached hereto as **Exhibit "30" and "31"**). The Title Company overseeing the transaction was Alliant National Title Insurance Company, and the escrow number was 18-06-137056JM (attached hereto as **Exhibit "32"**).

On December 31, 2018, Plaintiff purchased AZ Property No. 1 and AZ Property No. 2 for $668,475 from the Seller, USS Team Investments III LLC ("USS Team" or "Seller") using a Section 1031 Like-Kind Exchange". Additionally, the

Plaintiff paid an extra $30,000in transaction-related fees, bringing the total expenditure for the two houses to $698,475.12**.** The transaction was facilitated by Alliant National Title Insurance Company, under escrow number 18-06-137056JM (attached hereto as **Exhibit "30", "31", "32"**).

**41.** Engagement of  Kyle Scott for Assistance with the Arizona Properties Transaction:

The Plaintiff, a new immigrant and first-time entrepreneur in the United States with very limited English proficiency, hired Kyle Scott to assist her in completing the Arizona properties transaction. To facilitate the process,  Kyle Scott requested detailed information regarding the Plaintiff's finances, financial status, and resources.

**42. Payment Request from  Kyle Scott:**

On February 12, 2018,  Kyle Scott requested the Plaintiff to pay him $130,000 as compensation for services he claimed to have rendered in 2017 and 2018.

**43. Tax Avoidance Suggestion by  Kyle Scott:**

At that time,  Kyle Scott informed the Plaintiff that issuing him a 1099 form would result in significant tax liabilities. He requested that the Plaintiff transfer the $130,000 to him as a gift, assuring her that this was a lawful method of tax avoidance in

the United States. As a new immigrant unfamiliar with U.S. tax laws, the Plaintiff believed   Kyle Scott's assertions and agreed to his request.

### 44. Proposal for Additional Investments by  Kyle Scott:

Subsequently,   Kyle Scott suggested that the Plaintiff apply for a loan to purchase additional nursing homes. He proposed a plan to acquire 15 to 20 nursing homes, renovate them, and then package and sell them to a larger nursing home company for profit.

### 45. Plaintiff's Decision and Acquisition of AZ Properties:

After careful consideration, Plaintiff concluded that  Kyle Scott's plan to acquire and remodel additional more nursing homes was too risky, moreover, the Plaintiff, due to her lack of English proficiency, did not have a stable job, thus did not qualify for a loan. Instead, she opted to use the proceeds from a prior land sale to purchase the AZ Properties. Plaintiff acquired AZ Property No. 1 and AZ Property No. 2 for $668,475 through a Form 1031 Exchange (attached hereto as **Exhibit "30"**, and **"31"**) under Escrow Number 18-06-137056JM (attached hereto as **Exhibit "32"**).

### AZ Property No. 1 and AZ Property No. 2:

Plaintiff used the proceeds from a prior land sale to purchase these properties for $668,475.12 via a Form Section 1031 Like-Kind Exchange" under Yang Shao's name and Escrow Number  18-06-137056JM (attached hereto as **Exhibit "23"**, **"30"**, **"31"**, **"32"**).

**46.    On August 18, 2018 Defendant fabricated a loan commitment letter as the beginning of their fraudulent scheme.**

On August 11, 2022, four years after the closing, Defendant provided the Plaintiff with the loan and guarantee documents for the first time—documents of which the Plaintiff had no prior knowledge (attached hereto as **Exhibit "22"** ). Among these was a commitment letter dated August 18, 2018 (attached hereto as **Exhibit "3"** ), allegedly sent to the Plaintiff via email by  Karl Danlelian, the Defendant's Senior Vice President. However, the Plaintiff never received this email.

Moreover, the commitment letter contained two sets of signature pages bearing different signatures attributed to Plaintiff.

It is impossible for one person to produce varying signatures on the same document. This blatant inconsistency in the commitment letter alone serves as compelling evidence that the Defendant had been orchestrating a fraudulent scheme targeting the Plaintiff, exploiting her vulnerabilities as a new immigrant with limited English proficiency and mental health issues from the outset. This scheme was designed to entangle the Plaintiff in a fraudulent

**47.  Subsequently, Defendant forged Plaintiff's signature on SBA7(a) Borrower Information For - Representations , Authorizations and Certifications.**

Defendant colluded with  Kyle fraudulently copied, cut, and pasted Plaintiff Yang Shao's signatures from her prior land sale agreement dated August 3, 2017 (attached hereto as **Exhibit "23", Page 5**), forged Plaintiff Yang Shao's signature on SBA7(a) Borrower Information For - Representations, Authorizations and Certifications (attached hereto as **Exhibit "13"**).

**48. Fraudulent Warranty Deed and Deed of Trust Creation by Defendant and Title Company**

During the Title Company's handling of the sale of AZ Property No. 1 and AZ Property No. 2 by USS Team Investments III LLC to the Plaintiff Yang Shao, Defendant colluded with the

Title Company to produce a fraudulent Warranty Deed and Deed of Trust .

### 1). Step One: Incorrect Buyer Name

Defendant, in collaboration with the Title Company, deliberately listed the buyer of AZ Property No. 1 and AZ Property No. 2 as Endeavor 1 LLC instead of Plaintiff Yang Shao.

Plaintiff was the sole individual who used her personal funds totaling $698,475.12, derived from the proceeds of a prior land sale, to pay the previous owner for the purchase of AZ Property No. 1 and AZ Property No. 2 through a Form 1031 Exchange under her name (attached hereto as **Exhibit "23", "30"** and **"31"**).   No other individual or entity contributed a single dollar towards the purchase of AZ Property No. 1 and AZ Property No. 2. Accordingly, no person or entity other than Plaintiff Yang Shao has any legitimate claim to being the rightful owner of AZ Property No. 1 and AZ Property No. 2, nor can anyone challenge Plaintiff Yang Shao's exclusive and lawful ownership of these properties.

As this was a direct cash transaction facilitated under a Form 1031 Exchange, Plaintiff Yang Shao's name was required to appear on Escrow No. 18-06-137056JM for AZ Property No. 1 and

AZ Property No. 2. Listing another party, such as Endeavor 1 LLC, as the buyer was legally improper.

The total purchase funds of $698,475.12 for AZ Property No. 1 and AZ Property No. 2 were paid entirely out of Plaintiff's personal finances (attached hereto as **Exhibit "23"** and **"30"**). No other individual or entity paid any amount to the previous owner for the acquisition of these properties. Despite this, Defendant and the Title Company deliberately and unlawfully listed Endeavor 1 LLC as the buyer instead of Plaintiff Yang Shao.

The Defendant knowingly orchestrated this misrepresentation to fabricate loan agreements falsely identifying Endeavor 1 LLC as the borrower. Endeavor 1 LLC neither entered into any purchase agreements with the previous owner of AZ Property No. 1 and AZ Property No. 2 nor paid any funds for their acquisition. Listing Endeavor 1 LLC as the buyer instead of Plaintiff Yang Shao was entirely illegal. Had Plaintiff Yang Shao's name been listed as the buyer, it would have been apparent that a cash purchaser like the Plaintiff would not require a loan.

Despite Plaintiff's repeated requests to the Title Company to correct this misrecording, the Title Company failed to act. Listing Endeavor 1 LLC as the buyer instead of Plaintiff Yang Shao was legally improper and demonstrates a deliberate effort to obscure the true nature of the transaction.

## 2). Step Two: Fraudulent Inclusion of AZ Property No. 3

The Defendant had the Title Company also improperly included AZ Property No. 3 in the Escrow No. 18-06-137056JM Warranty Deed (attached hereto as **Exhibit 32**). This inclusion facilitated the Defendant in creating a false narrative that Endeavor 1 LLC purchased all three AZ Properties—AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3—through loans and fabricated guaranty documents.

Under U.S. tax law, Section 1031 Like-Kind Exchange"s require that the value of new properties purchased not exceed 20% more than the value of the previously sold property. The Plaintiff's prior land sale yielded $750,000, meaning the maximum allowable purchase amount for the new properties was $900,000 (attached hereto as **Exhibit "23"** and **Exhibit "31"**). The propsed three houses are priced at one million dollars for real estate (attached hereto as **Exhibit "24"**), exceeded this limit.

Furthermore, as a new immigrant without loan eligibility, Plaintiff could not have financed the purchase of three properties, particularly AZ Property No. 3. Therefore, the Plaintiff's Form Section 1031 Like-Kind Exchange proceeds were used exclusively to purchase the two properties actually owned by USS Team Investments III LLC—AZ Property No. 1 (attached hereto as **Exhibit "34"**) and AZ Property No. 2 (attached hereto as **Exhibit**

**"37"**). The inclusion of AZ Property No. 3 in the Warranty Deed was baseless and fraudulent.

The fraudulent inclusion of AZ Property No. 3 in Escrow No. 18-06-137056JM created a false record of the Plaintiff acquiring all three properties. This misrepresentation further enabled the Defendant to fabricate loan contracts, Deed of Trust and guaranty documents associated with the purchase of the AZ Properties. Despite the Plaintiff's repeated requests for the Title Company to correct this fraudulent Warranty Deed (attached hereto as **Exhibit "32"**), no action was taken.

### 3). Step Three: Fraudulent Loan Agreement Creation

The Defendant, in collusion with T i t l e   C o m p a n y executed A fraudulent $3.05 million loan agreement. This agreement falsely listed Endeavor 1 LLC—a shell company that neither signed a purchase agreement for the AZ Properties nor contributed any payment toward their purchase—as the borrower.

Under normal circumstances, it is inconceivable and unreasonable for a bank to enter into a $3.05 million loan agreement with a shell company like Endeavor 1 LLC. This company neither signed a purchase agreement for the AZ Properties, nor had involvement in the financial contributions of AZ Properties purchase, and had no legitimate ownership interest

in the AZ Properties. Such an arrangement defies standard banking and lending practices and demonstrates clear intent to fabricate a false transaction.

### 4). Step Four: Fraudulent Deed of Trust Creation

The Defendant colluded with  Kyle Scott to execute a fraudulent Deed of Trust in Endeavor 1 LLC's name. Under normal circumstances, it is inconceivable for a bank to accept a Deed of Trust from Endeavor 1 LLC, a party that neither signed a purchase agreement for the AZ Properties nor contributed any payment, there for, it is unreasonable to consider Endeavor 1 LLC as the owner of the AZ Properties and allow it to execute a Deed of Trust. This fraudulent conduct caused substantial harm to Plaintiff Yang Shao's ownership interests in the AZ Properties, undermining her rightful claims and property rights of AZ Property No. 1, AZ Property No. 2.

### 5). Step Five: Fraudulent Transfer of Ownership

The Plaintiff completed the full cash purchase of AZ Property No. 1 and AZ Property No. 2 on December 31, 2018 (attached hereto as **Exhibit "30"**). However, the Defendant and theTitle Company, without the Plaintiff's knowledge or presence, improperly listed the ownership of AZ Property No. 1 and AZ Property No. 2 under Endeavor 1 LLC on November 6, 2018. This

transfer was carried out without notifying the Plaintiff, who was the sole party providing the full payment for the AZ Properties (attached hereto as **Exhibit "30," "31," and "32"**). This action is both unreasonable and illegal.

This fraudulent conduct caused substantial harm to Plaintiff's ownership interests in the AZ Properties, undermining her rightful claims and property rights of AZ Property No. 1, AZ Property No. 2.

## 49. Tax Law Limitations and Plaintiff's Financial Ineligibility

Plaintiff was advised by her accountant that under U.S. tax law, when purchasing properties through a 1031 exchange, the purchase price of the new properties cannot exceed 120% of the sale price of the previously exchanged property. Based on the prior land sale price of $750,000, the maximum allowable transaction amount for the Arizona Properties was $900,000.

Given this legal limitation, it would have been impossible for the Plaintiff to purchase three properties or to sign a real estate purchase agreement for $3.495 million with the Seller. Additionally, the Plaintiff could not have taken out a $3.05 million loan from the Defendant, as she lacked both the financial means and eligibility for such a loan.

This clear restriction under U.S. tax law, combined with the Plaintiff's financial situation, directly contradicts any claims that the Plaintiff entered into agreements to purchase three properties or obtained a $3.05 million loan.

### 50. Payment Breakdown for the Purchase of AZ Property No. 1 and AZ Property No. 2

To complete the purchase of the two properties (AZ Property No. 1 and AZ Property No. 2), Alliant National Title Insurance Company ("Title Company") instructed Plaintiff to make five separate wire transfers from August 9, 2018 through December 31, 2018, amounting to a total of $698,475.12. This sum comprised $668,475.12 for the purchase price and $30,000 for transaction fees. The wire transfers were made as follows (attached hereto as **Exhibit "30"**):

**1).** August 9, 2018: The Title Company instructed Plaintiff to transfer $50,000. Plaintiff transferred $50,000 on the same day (attached hereto as **Exhibit "38"**).

**2).** October 11, 2018: The Title Company instructed Plaintiff to transfer $100,000. Plaintiff transferred $100,000 on the same day (attached hereto as **Exhibit "39"**).

**3).** October 22, 2018: The Title Company instructed Plaintiff to transfer $15,000. Plaintiff transferred $15,000 on the same day (attached hereto as **Exhibit "40"**).

**4).** November 5, 2018: The Title Company instructed Plaintiff to transfer $518,475.12. Plaintiff transferred $518,475.12 on the same day (attached hereto as **Exhibit "41"**).

**5).** December 31, 2018: The Title Company instructed Plaintiff to transfer $15,000. Plaintiff transferred $15,000 on the same day (attached hereto as **Exhibit "42"**).

From August 9, 2018 through December 31, 2018, Plaintiff Yang Shao completed a total transfer of $698,475.12 to the Title Company to finalize the purchase of AZ Property No. 1 and AZ Property No. 2 (attached hereto as **Exhibit "30"**).

Plaintiff Yang Shao did not complete the final payment for the purchase of AZ Property No. 1 and AZ Property No. 2 until December 31, 2018. However, prior to this, on November 6, 2018, the Defendant and the Title Company improperly transferred the title of AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3 to Endeavor 1 LLC. This transfer was made despite the fact that Endeavor 1 LLC had neither entered into a purchase agreement with the seller nor contributed a single penny toward the purchase of the AZ Properties.

This act is unreasonable and improper. Such an arrangement defies standard banking and lending practices and demonstrates clear intent to fabricate a false transaction. This fraudulent conduct caused substantial harm to Plaintiff's ownership interests in the AZ Properties of AZ Property No. 1, AZ Property No. 2, undermining her rightful claims and property rights.

## 51.  Absence of a Signed Purchase Agreement

Plaintiff never signed a real estate purchase agreement with the previous owner USS Team Investments III LLC for $3.495 million to acquire the Arizona Properties. Moreover, Plaintiff never borrowed $3.05 million from Defendant Customers Bank. The real estate purchase agreement was purportedly intended to serve as the foundation for the loan contract. Without Plaintiff having signed a $3.495 million real estate purchase agreement with the Seller, it would have been impossible for a $3.05 million loan contract between Defendant and Plaintiff to exist.

Even if Plaintiff had considered purchasing the three Arizona properties, it would have been illogical and unreasonable for Plaintiff to agree to a $3.495 million purchase price when the market value of the three properties at the time was under $1,583.700 million (attached hereto as **Exhibit 12**).

## 52. Identification of Actual Purchaser and Fraudulent Transactions

The fraudulent purchaser of the Arizona Properties valued at $3.495 million, was Kyle Scott's company, Endeavor US LLC which never contributed any funds towards the purchase of these properties (attached hereto as **Exhibit "1"**).

Plaintiff's late attorney,  Brian Stanley, obtained all closing documents pertaining to this real estate transaction by subpoenaing the Title Company with court approval (attached

hereto as **Exhibit "43"**). Among these documents, the "Buyer / Seller（Owner） Information (Please Complete and Return)" explicitly identifies  Kyle Scott as the purchaser of  Arizona Properties three houses (**AZ Property No. 1 and AZ Property No. 2 and AZ Property No. 3). Plaintiff** is not listed as the purchaser of these properties (attached hereto as **Exhibit "15"**).

On June 12, 2018,  Kyle Scott and his company, Endeavor US LLC ("Endeavor US"), entered into a fraudulent purchase agreement with Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively, "Adagios") to acquire Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3) for $3.495 million. This fraudulent agreement served as the foundation for the fraudulent loan to Defendant Customers Bank and the subsequent disbursement of loan funds (attached hereto as **Exhibit "1"** and **"2"**).

**53. Fraudulent Ownership Claims and Defendant's Negligence**

Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively, "Adagios") were never the rightful owners of the Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3) (attached hereto as **Exhibit "2"**). The purchase agreement between  Kyle Scott and the "Adagios" was entirely fraudulent.

Had Defendant conducted even minimal due diligence, such As verifying ownership records through the Maricopa County Assessor's website, it would have been clear that the "Adagios" did not hold legal ownership of the Arizona Properties. Verifying property ownership is a standard and essential step in the loan approval process, yet Defendant failed to perform this critical task.

Based on this fraudulent purchase agreement, Defendant entered the $3.05 million loan agreement with Kyle Scott and his company Endeavor US LLC, without conducting the necessary verification. This failure to exercise due diligence directly enabled the fraudulent loan approval and subsequent disbursement of funds.

## 54. Fraudulent Exploitation of Plaintiff's Identity and Misrepresentation of Property Values

To conceal the fraudulent real estate loan application, Defendant's Senior Vice President, Karl Danlelian misuse Plaintiff Yang Shao's personal and financial information, had access to Plaintiff's sensitive information while representing her in the sale of a previous property, exploited her position as a vulnerable new immigrant with limited English proficiency and a mental health condition. forged loan and guarantee documents, falsely implicating Plaintiff and fabricating a narrative that she and her company Endeavor 1 LLC had applied for a loan and provided collateral to Defendant.

On August 18, 2018 Defendant fabricated a loan commitment letter as the beginning of their fraudulent scheme.

On August 11, 2022, four years after the closing, the Defendant provided the Plaintiff with the loan and guarantee documents for the first time—documents of which the Plaintiff had no prior knowledge (attached hereto as **Exhibit "22"**). Among these was a commitment letter dated August 18, 2018 (attached hereto as **Exhibit "3"**), allegedly sent to the Plaintiff via email by Karl Danlelian, the Defendant's Senior Vice President. However, the Plaintiff never received this email.

Moreover, the commitment letter contained two sets of signature pages bearing different signatures attributed to Plaintiff Yang Shao. It is impossible for one person to produce varying signatures on the same document. This blatant inconsistency in the commitment letter alone serves as compelling evidence that the Defendant had been orchestrating a fraudulent scheme targeting the Plaintiff, exploiting her vulnerabilities as a new immigrant with limited English proficiency and mental health issues from the outset. This scheme was designed to entangle the Plaintiff in a fraudulent loan transaction of which she had no awareness.

Subsequently, Defendant forged Plaintiff's signature on SBA7(a) Borrower Information For - Representations , Authorizations and Certifications (attached hereto as **Exhibit "13"**).

Defendant fraudulently copied, cut, and pasted Plaintiff Yang Shao's signatures from her prior land sale agreement dated August 3, 2017 (attached hereto as **Exhibit "23", Page 5**), forged Plaintiff's signature on SBA7(a) Borrower Information For - Representations, Authorizations and Certifications (attached hereto as **Exhibit "13"**).

Furthermore, Defendant manipulated the property appraisal to secure approval from the Small Business Administration (SBA) for the fraudulent loan. Defendant inflated the appraisal value of the Arizona Properties from their actual 2018 market value of under $1,583,700 to $3.09 million, deceiving the SBA into granting approval (attached hereto as **Exhibit "11"** and **"12"**).

This scheme came to light only after Plaintiff's persistent efforts over four years. On August 11, 2022, four years after the transaction was completed, Defendant provided Plaintiff with the loan and guarantee documents for the first time, which Plaintiff had never seen before (attached hereto as **Exhibit "22"**). Subsequently, Plaintiff's late attorney, Brian Stanley, filed a subpoena with the court on September 19, 2022, obtaining materials that confirmed the fraudulent nature of this transaction (attached hereto as **Exhibit "43"**). The details of this fraudulent scheme are outlined as follows:

• Plaintiff's personal and financial information was misused without her knowledge.

• Real estate purchase agreement, Loan and guarantee documents were forged to falsely implicate Plaintiff.

• The appraisal value of the properties was fraudulently inflated to deceive the SBA.

• Plaintiff was unaware of the loan and guarantee documents until August 11, 2022.

• Defendant's fraudulent conduct was further confirmed by documents obtained via subpoena.

## 1). Fraudulent Purchase Agreement as Basis for Defendant's Loan

On June 12, 2018, Kyle Scott and his company, Endeavor US LLC ("Endeavor US"), entered into a fraudulent purchase agreement with Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively "Adagios") to purchase the Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3) for $3.495 million. This fraudulent agreement served as the premise and basis for Defendant's fraudulent loan application and subsequent loan disbursement (attached hereto as **Exhibit 1**).

## 2). Fraudulent Ownership Claim by the "Adagios"

In fact, Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively "Adagios") were not the actual owners of the Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3) (attached hereto as **Exhibit "2"**).

### 3). Failure to Verify Ownership in Fraudulent Real Estate Purchase Agreement

This real estate purchase agreement was entirely fraudulent. If the Defendant had conducted a simple inquiry on the Maricopa County Assessor's website, they would have discovered that Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively, "Adagios") were not the actual owners of the Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3). Verifying property ownership is a critical step in the loan approval process, yet the Defendant failed to fulfill this fundamental requirement (attached hereto **as Exhibit "2"**).

### 4). Fabrication of a Loan Commitment Letter

The Defendant fabricated a loan commitment letter as part of their fraudulent scheme.

On August 11, 2022, four years after the closing, the Defendant provided the Plaintiff with the loan and guarantee documents for the first time—documents of which the Plaintiff had no prior knowledge (attached hereto as **Exhibit "22"**). Among these was a commitment letter dated August 18, 2018 (attached hereto as **Exhibit "3"**), allegedly sent to the Plaintiff via email by Karl Danlelian, the Defendant's Senior Vice President. However, the Plaintiff never received this email.

Moreover, the commitment letter contained two sets of signature pages bearing different signatures attributed to Plaintiff.

It is impossible for one person to produce varying signatures on the same document. This blatant inconsistency in the commitment letter alone serves as compelling evidence that the Defendant had been orchestrating a fraudulent scheme targeting the Plaintiff, exploiting her vulnerabilities as a new immigrant with limited English proficiency and mental health issues from the outset. This scheme was designed to entangle the Plaintiff in a fraudulent loan transaction of which she had no awareness.

### 5). Forgery of Operating Agreements

On September 4, 2018, in collusion with Defendant's internal bank personnel, Karl Danlelian, Kyle Scott forged the operating agreements of Plaintiff's companies Endeavor 1 LLC and Endeavor AL LLC (collectively, "Endeavors"). Kyle Scott copied, cut, and pasted Plaintiff's signatures from her prior land sale agreement dated August 3, 2017 (attached hereto as **Exhibit "23"**) and falsely represented his company, "Axcent," as the operating manager of Plaintiff's companies (attached hereto as **Exhibits "8"-"10"**). This scheme was designed to entangle the Plaintiff in a fraudulent loan transaction of which she had no awareness.

### 6). Failure to Verify Axcent's Legal Status

Defendant's internal bank personnel entered into forged loan documents and a Deed of Trust. A simple search on the Arizona Corporation Commission website would reveal that Kyle Scott's company, Axcent, is an unregistered foreign entity in Arizona,

rendering it ineligible to sign any contracts or Deeds of Trust. Verifying the legal status of Axcent was a mandatory step in the loan approval process, but the Defendant failed to conduct this essential due diligence (attached hereto as **Exhibit "44"**).

### 7). Handwriting Examination Confirms Forgery

Defendant's internal bank personnel entered into forged Note, guarantee documents, and Mortgage. These forgeries were confirmed through three rounds of handwriting examinations (attached hereto as Exhibit **"8" - "10"**).

### 8 ).   Unauthorized Signing of Documents

Plaintiff never authorized any individual or company to sign AZ real estate purchase agreement at price for $3.495 M with any Seller , let alone loan documents, Notes, Deed of Trust, guarantee documents, or Mortgages on her behalf or on behalf of her company.

### 9). To secure SBA approval for the loan, Defendant engaged in fraudulent activities to deceive the SBA:

**(1).** Defendant submitted a fraudulent Purchase-Sale Agreement to the SBA (attached hereto as **Exhibit "1"**).

On September 19, 2022, Plaintiff's late attorney, Brian Stanley, obtained all materials related to this real estate

transaction through a subpoena issued to the Title Company (attached hereto as **Exhibit "43"**). Among these Closing documents, Plaintiff discovered for the first time an SBA 7(A) Guaranteed Loan Authorization, a document Plaintiff had never received (attached hereto as **Exhibit "11"**). This loan authorization explicitly required an Executed Purchase-Sale Agreement to be obtained before disbursement (**Exhibit "11" page 12, section 3(b)(2)**).

Plaintiff also saw the Purchase-Sale Agreement for the first time among these Closing documents: on June 12, 2018, Kyle Scott and his company, Endeavor US LLC ("Endeavor US"), entered into a purchase agreement with Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively, "Adagios") to acquire the Arizona Properties—AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3—for $3.495 million (attached hereto as **Exhibit "1"**). This agreement served as the premise and basis for Defendant's $3.05 million loan and its disbursement.

All of these actions occurred without Plaintiff's knowledge or involvement.

However, Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC ("Adagios") were not the actual owners of the Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3) (attached hereto as **Exhibit "2"**). This Purchase-Sale Agreement is fraudulent. A simple search on the Maricopa County Assessor's website would have revealed that Adagios had no ownership of the Arizona Properties. This verification is a standard and

essential step in loan approval processes, yet Defendant failed to perform it.

Instead, Defendant approved the loan application Submitted by Kyle Scott and his company Endeavor US LLC based on this fraudulent Purchase-Sale Agreement.

The fraudulent Purchase-Sale Agreement was the foundation and starting point of the scheme to secure the SBA loan and disbursement fraudulently.

**(2).** Defendant subsequently submitted fraudulent Purchase-Sale a greement, loan documents, guarantee agreements, Deed of Trust, and Mortgage to the SBA. The Purchase-Sale Agreement served as the premise and foundation of the loan documents. Without a legitimate purchase, how could there be a loan? Without a legitimate purchase, why would a loan be necessary? A fraudulent Purchase-Sale Agreement could only result in a fraudulent loan.

Plaintiff and her company Endeavor 1 LLC never entered a purchased the AZ Properties at the price for $3.495 M. How could Plaintiff possibly take out a $3.05 million loan from Defendant for purchasing these properties? In this case, it was Kyle Scott and his company, Endeavor US LLC ("Endeavor US") , who were involved in the purchase of the AZ Properties (attached hereto as **Exhibit "2"**). So how is it possible that a loan agreement exists stating Plaintiff and

her company Endeavor 1 LLC borrowed $3.05 million from Defendant for purchasing these properties?

The only explanation is this: the loan agreement was also fabricated, and any guarantee agreements based on this fraudulent loan agreement are equally fraudulent. After three rounds of handwriting examinations, it has been conclusively determined that all signatures on the guarantee documents were forgeries (attached hereto as **Exhibits "8"–"10"**).

In this case, the fraudulent Purchase-Sale Agreement was the initial step in the scheme, while the guarantee agreements were the final product in the scheme. With both the purchase and guarantee agreements proven to be fraudulent, how could the loan agreement in between be genuine?

 **(3).** Defendant inflated the appraisals of Arizona Properties (three houses) to deceive the Small Business Administration (SBA). Through a subpoena issued by Plaintiff's late attorney  Brian Stanley on September 19, 2022,  the complete documentation of the real estate transaction was obtained from the title company (attached hereto as **Exhibit "43"**). This was the first time Plaintiff saw an SBA 7(A) Guaranteed Loan Authorization, a document Plaintiff never received (attached hereto as **Exhibit "11"**). Plaintiff found that Defendant had inflated the appraisals of the Arizona Properties (three houses) to $3.09 million in 2018 to deceive the SBA.

**i. According to the SBA 7(A) Guaranteed Loan Authorization (**attached hereto as **Exhibit "11"),** Defendant was required to ensure that the appraised value of the Arizona Properties (three houses) was **not less than $3.09 million** before disbursement of the loan (attached hereto as **Exhibit "11" p13, Term"6"- Appraisal**):

• AZ Property No. 1 (5328 E Anderson Drive, Scottsdale, AZ): Not less than $1 million.
• AZ Property No. 2 (4839 E Charleston Ave, Scottsdale, AZ): Not less than $1 million.
• AZ Property No. 3 (17814 N 56th Street, Scottsdale, AZ): Not less than $1.09 million.

**ii. However, the actual median market value of the Arizona Properties in 2018 was less than $1,583,700— under $1.6 million (**attached hereto as **Exhibit "12").**

Because the Maricopa County Assessor public website only provides real estate market prices from the past five years, data for 2018 cannot be obtained. However, since the United States was still in the midst of an economic crisis in 2018, real estate prices were generally lower than in 2020. The actual median market value of the Arizona Properties (three houses) in 2018 was less than $1,583,700 (attached hereto as **Exhibit "12"**).

**In 2020, the market value for the Arizona Properties were as $1,583,700 :**

- **AZ Property No. 1** (5328 E Anderson Drive, Scottsdale, AZ): $536,600
- **AZ Property No. 2** (4839 E Charleston Ave, Scottsdale, AZ): $557,100
- **AZ Property No. 3** (17814 N 56th Street, Scottsdale, AZ): $490,000

**iii.** Moreover, the Arizona Properties were zoned as R1-10, and under Phoenix City zoning regulations, side yards must not be less than 7 feet (attached hereto as **Exhibit "27"**). During prior renovations, the seller overbuilt the properties, reducing the side yards to less than 7 feet, rendering the structures illegal (attached hereto as **Exhibit "28"**).

If Plaintiff had purchased the three properties, she would have needed to invest at least $500,000 to bring the buildings into compliance with Phoenix City zoning regulations. This significant required renovation lowered their appraised value.

Even in 2023, after three years of a real estate boom, and assuming the properties are considered legal structures, their median combined market value was **$2,254,700:**

- AZ Property No. 1 (5328 E Anderson Drive, Scottsdale, AZ): $770,100
- AZ Property No. 2 (4839 E Charleston Ave, Scottsdale, AZ): $773,000

• AZ Property No. 3 (17814 N 56th Street, Scottsdale, AZ): $711,600

Even in 2023, after three years of a real estate boom, Arizona properties's value was still far below $3.09 million, Defendant's 2018 appraisals of the Arizona Properties which Defendant submitted to for deceiving Small Business Administration (SBA) (attached hereto as **Exhibit "11 "** and **Exhibit "12" ):**

It is inconceivable that Defendant valued the properties at $3.09 million in 2018. This inflated valuation demonstrates Defendant's fraudulent scheme to deceive the SBA by artificially increasing the appraised value of the collateral to secure a SBA loan (attached hereto as **Exhibit "11"** and **"12").**

**(4).** Defendant engaged in covert operations and concealed all facts and information from Plaintiff.

Through a subpoena issued by Plaintiff's late attorney,  Brian Stanley, the complete documentation of the real estate transaction was obtained from the title company (attached hereto as **Exhibit "43"**). For the first time, Plaintiff saw the SBA 7(A) Guaranteed Loan Authorization, a document Plaintiff never received (attached hereto as **Exhibit "11"**).

The SBA 7(A) Guaranteed Loan Authorization, on page 13, section 7(a)(1), explicitly required that a copy of this document be provided to the borrower before the loan disbursement. However, Plaintiff and Plaintiff's company Endeavor 1 LLC never received this document.

Without being the borrower, it would have been impossible for Plaintiff and her company Endeavor 1 LLC to receive the SBA Authorization document or to have any knowledge of its contents. This demonstrates Defendant's deliberate withholding of critical information from Plaintiff, further reinforcing the fraudulent nature of this transaction.

**10). Defendant forged Loan documents: Note**.

On August 11, 2022, four years after the closing, Defendant sent the loan documents and guarantee document to Plaintiff for the first time, documents of which Plaintiff had no prior knowledge (attached hereto as **Exhibit "22"** ), including a Note (attached hereto as **Exhibit "4"** ). Subsequently, on August 25, 2023, Defendant submitted the other version of the Note to the court (attached hereto as **Exhibit 5** ).

These two notes are different versions, yet both contained Mr. Kyle Scott's identical signature pages. It is impossible for a person to produce two different version documents with identical signatures on both. The appearance of these two Notes provides unequivocal evidence that Defendant forged loan documents, specifically the Note (attached hereto as **Exhibit "4" and "5"** ).

**11). Defendant forged mortgage documents for the property at 524 E. 14th Avenue, Naperville, Illinois.**

On August 11, 2022, four years after the closing, Defendant sent the loan document and guarantee document to Defendant for the first time, of which Plaintiff had no prior knowledge (attached hereto as **Exhibit "22"**), including a mortgage document for the property at 524 E.14th Avenue, Naperville, Illinois (attached hereto as **Exhibit "6"**), which Plaintiff had no prior knowledge. Subsequently, on August 25, 2023, Defendant submitted the other version of mortgage document for the property at 524 E. 14th Avenue to the court (attached hereto as **Exhibit "7"**).

These two mortgage documents are different versions, however both contained Plaintiff identical signature pages. It is impossible for a person to produce two different version documents with identical signatures on both. The appearance of these two mortgage documents provides clear evidence that Defendant forged loan documents, specifically the mortgage documents (attached hereto as **Exhibit "6" and "7"**).

**12). Defendant engaged in fraud by colluding with Kyle Scott and his partners, Richard Murray and and Tod Decker, to deceive the SBA.**

Plaintiff, a newly immigrated single mother ,did not meet the qualifications to be a SBA loan guarantor. Despite this

Defendant, in collusion with Kyle Scott and his partner
Richard Murray, falsely presented them as
guarantors and facilicated the signing of fraudulent
guarantee documents to meet the SBA's guarantor
requirements. Defendant also forged Plaintiff's signatures on the
guarantee documents (attached hereto as **Exhibit "8" - "10"**).

On November 2, 2018, Defendant instructed Title Company to
release loan funds to Adagios based on the fladuent real estate
purchase agreement (attached hereto as **Exhibit "1", "16"**).
Subsequently, on November 6, 2018, Defendant Authorized
Title Company to release loan funds to Adagios based on the
fladuent real estate purchase agreement (attached hereto as **Exhibit
"1", "17"**).

However, Title Company did not follow Defendant 's instruction
and wrongly released the loan funds to USS Team Investments III
LLC on November 6, 2018 (attached hereto as **Exhibit "18"** ).
On the same day, Kyle Scott authorized Title Company to
wire $198,000 to his partner Richard Murray and Tod
Decker as a "consultation fee" . Tod Decker received
$53,540, and Richard Murray received $144,793.33
(attached hereto as **Exhibit "19"** and **"20"**).

When recommending that Plaintiff purchase the
AZ Properties, Kyle Scott further introduced
Plaintiff to his partners, Richard Murray and
Tod Decker, claiming that they would purchase the
business. Kyle Scott assured Plaintiff that she
could lease the properties she purchased AZ property

No.1 and AZ property No.2 to   Tod Decker for profit. However, this promise was never fulfilled. Instead, the AZ Properties (specifically AZ Property No. 1 and AZ Property No. 2), which Plaintiff purchased using $698,475.12 from her own funds, were fraudulently transferred to Endeavor 1 LLC, the company that neither signed any purchase agreement for the AZ Properties nor contribute a single dollar toward the purchase. Subsequently, the Defendant forcibly auctioned the Defandant's properties AZ Property No. 1 and AZ Property No. 2 which Plaintiff purchased using $698,475.12 from her own funds.

   After forcibly auctioning off Plaintiff's Arizona Properties, Defendant unilaterally withdrew the claims in this case against  Kyle Scott and his partner, Richard Murray, allowing them to evade their full guarantor liabilities for the loan. This carefully orchestrated scheme clearly demonstrates Defendant's intentional fraudulent conduct while enabling key accomplices to escape accountability.

   This sequence of events clearly demonstrates that the entire transaction was a deliberate scheme from the outset.

   **13).  Defendant Colluded with the Title Company to Conceal the Closing from Plaintiff.**

Through a subpoena issued by Plaintiff's late attorney, Brian Stanley, the complete documentation of the real estate transaction was obtained from the title company (attached hereto as **Exhibit "43"**). Among these documents, Plaintiff saw the Identification Verification and Notary Certification for the first time (attached hereto as **Exhibit "21"**).

This Closing document clearly identifies four parties involved in the transaction: Kyle Scott, Richard Murray, William Phillips, and Mrs. Mihaela Phillips. Plaintiff was not a party to this Closing and had no knowledge of its existence or any related details. Defendant colluded with the Title Company to intentionally conceal the Closing from Plaintiff (attached hereto as **Exhibit "21"**).

**14).  Defendant engaged in fraud by providing false notarial records, which included a date but lacked a specific time, contained a forged signature, and listed a fictitious notarial location. Defendant hired a notary to commit perjury. Plaintiff has never met or contacted the notary hired by Defendant.**

The notarial records submitted to the court on behalf of Defendant are falsified. They lack a specific notarization time, and the stated notarization location：735 Executive Dr, Aurora, IL, does not exist. A Google Maps search for this address yields no results, and upon physically driving along Executive Dr in Aurora, IL, Plaintiff found no such location (attached hereto as **Exhibit "14"**).

Furthermore, the Plaintiff's signature on the notarial records was forged, as confirmed by multiple handwriting examinations (attached hereto as **Exhibits "8"–"10").**

**15).    On November 2, 2018, Defendant  instructed the Title Company to release $3.05 million to the fraudulent seller :** Adagios  which based on fraulent a real estate purchase agreement on June 12, 2018, with  Kyle Scott's company, Endeavor US for the Arizona Properties at a price of $3.495 million (attached hereto as **Exhibit "1", "16"**). In Defendant's instruction letter to the Title Company, Defendant explicitly stated: "If  Title Company does not release the $3.05 million loan funds to Adagios as instructed by Defendant, Title  Company  will  not  receive  any  service fees."(attached hereto as **Exhibit "16"**).

This  directive  was  tied  to  a  fraudent  real  estate  purchase agreement executed on June 12, 2018, between Adagios and Kyle Scott's company, Endeavor US LLC, for the Arizona Properties at a price of $3.495 million. This agreement served as the  premise  and  basis  for  Defendant's  loan  and  its  disbursement (attached hereto as **Exhibit "1"**).

This  evidence  clearly  demonstrates  that  the  instruction  to release  the  $3.05  million  loan  funds  had  no  connection  to Plaintiff.

**16).    On November 6, 2018, Defendant authorized the Title Company  to  release  $3.05  million  in  loan  funds  to  the**

**fraudulent seller :**  Adagios  which based on fraulent a real estate purchase agreement on June 12, 2018, with   Kyle Scott's company, Endeavor US  for  the  Arizona  Properties  at  a  price  of $3.495  million  (attached  hereto  as  **Exhibit  "1",  "17"**).  This evidence  clearly  demonstrates  that  Defendant's  authorization  to release  the  $3.05  million  loan  funds  had  no  connection  to Plaintiff.

**17).    On  the  same  day  (November  6,  2018),   Kyle Scott  authorized  Title  C o m p a n y  to  wire  $198,000  to  his partner    Richard  Murray  a n d   Tod  Decker  as  a "consultation fee"** .  Tod  Decker  received  $53,540,  and  Richard  Murray  received  $144,793.33  (attached  hereto as **Exhibit "19"** and**"20"**).

**18). Defendant  has  deliberately  concealed  parts  of  the conversation  between  Plaintiff  and  Defendant,  hiding  the  fact** such  as  that  Plaintiff  was  unaware  of  loan  and  the  interest  rate. Plaintiff  declares  under  penalty  of  perjury  under  the  laws  of  the State  of  Arizona  that  Defendant  has  intentionally  concealed  parts  of  the conversation,  thereby  creating  a  false  impression  that  Plaintiff  was aware  of  the  loan  terms.  Even  assuming  Plaintiff  knew  about  the loan,  does  that  mean  Plaintiff  executed  the  loan?

The facts are as follows: On August 28, 2020, after two years of persistent effort,  Kyle Scott finally provided Plaintiff with the contact information for the bank representative, Mrs. Cristina Fierroz. The facts are outlined in **Exhibit "45".**


Defendant clearly acknowledged in correspondence with Plaintiff that Defendant was obligated to inform Plaintiff about the loan, but Defendant failed to do so. Defendant's responses to Plaintiff's inquiries included:

 • "That's ok. I apologize for the delay in getting back to you. I thought you had the information already." [sic]

 • "Hi, good morning, can you please tell me what the interest rate is? Thank you so much!" [sic]

Defendant did not respond.

 • "Good afternoon, can we have a meeting next week?" [sic]

Once again, Defendant did not respond and ceased further communication. (attached hereto as **Exhibit "45").**

Plaintiff made numerous attempts to communicate with Defendant, but Defendant intentionally ignored her. How could Plaintiff have signed a loan agreement, guarantee document, or mortgage

document in 2018 without knowing the principal or the interest rate? In fact, what Plaintiff discovered was a blank loan agreement left behind by  Kyle Scott, with the loan amount of $3.05 million filled in but no interest rate indicated, and the signature section left blank. Plaintiff repeatedly contacted Defendant to request a meeting to clarify the situation, but Defendant ignored her.

**19).  Plaintiff swears under penalty of perjury that until August 28, 2020, she had never even heard of the name "Customers Bank," let alone had any knowledge of the existence of any so-called loan.**

Defendant Customers Bank claims to be a Pennsylvania corporation. Plaintiff disputes the legitimacy of Defendant's status as a Pennsylvania corporation engaged in banking services in 2018, the period during which Defendant alleges that Plaintiffs borrowed and guaranteed a loan.

After conducting an official search on Pennsylvania's government company registration website, Plaintiff Yang Shao discovered that three separate entities named "Customers Bank" are registered in Pennsylvania. These entities are as follows:

**(1).** Customers Bank (Entity No. 2572797), a Name Reservation entity active only from March 25, 1994, to July 23, 1994, and subsequently dissolved;

**(2).** Customers Bank (Entity No. 3978974), a Fictitious Name active since September 10, 2010, which lacks the legal authority to operate as a lending institution;

**(3).** Customers Bank (Entity No. 4036716), a Domestic Financial Institution formed on March 29, 2011, which was not formally recognized as "Customers Bank" until June 10, 2022.

It remains unclear which of these entities is the Defendant in this case. Without this clarification, Defendant's allegations cannot be properly evaluated**. (**attached hereto as **Exhibit "46"** )

If the Defendant is the first entity, Customers Bank (Entity No. 2572797), it is inconceivable that Defendant could claim Plaintiffs borrowed funds in 2018 from an entity dissolved in 1994. Similarly, if the Defendant is the second entity, Customers Bank (Entity No. 3978974), which operates under a Fictitious Name, it does not possess the legal status of a lending institution and thus could not have lawfully issued any loans. Finally, if the Defendant is the third entity, Customers Bank (Entity No. 4036716), it did not legally operate under the name "Customers Bank" until June 10,

2022. Any actions conducted under the name "Customers Bank" between 2011 and June 2022 would constitute fraudulent activity, exploiting the credit of a legitimate bank for improper gain and carried out under the false pretense of being a lawful financial institution. Consequently, any actions taken during this period are invalid. **(**attached hereto as **Exhibit "46" )**

Therefore, Plaintiffs respectfully request that the Court compel Defendant to clarify its legal identity and address these significant discrepancies.

Defendant's claim of being Customers Bank, a Pennsylvania corporation, is highly questionable. As confirmed through Plaintiff's search of the Pennsylvania government's company registration records, Defendant was not established until March 29, 2011, and did not formally adopt the name "Customers Bank" until June 10, 2022. Any business activities Defendant conducted under the name "Customers Bank" before June 10, 2022, represent fraudulent misuse of a bank's name and its associated credit. These actions raise serious doubts about Defendant's claims regarding the loan allegedly borrowed and guaranteed by Plaintiffs in 2018. **(**attached hereto as **Exhibit "46" )**

**Plaintiff was unaware of both the so-called principal and the interest rate.** Defendant never provided her any loan documents, Deed of Trust, guarantee documents, or mortgage documents.

It was not until August 11, 2022—two full years after repeated requests—that Defendant finally sent Plaintiff the alleged loan, guarantee, and mortgage documents for the first time (attached hereto as **Exhibit "22"**). At this point, almost four years had passed since the Closing, . On September 19, 2022, through a subpoena issued by Plaintiff's late attorney,  Brian Stanley, the complete documentation of the real estate transaction was obtained from the title company (attached hereto as **Exhibit "43"**). It was only then that Plaintiff had the opportunity to review these alleged documents. Upon review, Plaintiff immediately discovered that:

**(A).** The so-called Purchase-Sale Agreement, loan, guarantee, Deed of Trust, and mortgage documents contradict each other and fail to corroborate the transaction:

**i.** The Closing documents provide conflicting information regarding the Buyer and Seller:

• According to the Buyer And Seller Information form in the Closing documents, the Buyer is  Kyle Scott, and the Seller is USS Team Investments III LLC (attached hereto as **Exhibit "15"**).

- However, the Purchase-Sale Agreement within the Closing documents identifies the Buyer as Endeavor US LLC, an Arizona limited liability company, and the Sellers as Adagio House I & II PLC, Adagio House II LLC, and Adagio House III LLC (collectively referred to as "Adagios") (attached hereto as **Exhibit "1"**).

These two critical Closing documents, intended to define the Buyer and Seller in this transaction, directly contradict one another, creating irreconcilable conflicts.

**ii.** The Purchase-Sale Agreement in the Closing documents identifies the Buyer as Endeavor US LLC, an Arizona limited liability company (attached hereto as **Exhibit "1"**).

Accordingly, the loan applicant and the issuer of the Deed of Trust for Defendant's loan should also be Endeavor US LLC.

However, the Closing documents list the loan applicant and the issuer of the Deed of Trust as Endeavor 1 LLC (attached hereto as **Exhibit "18"**).

These three key Closing documents, which are meant to define the loan applicant and the issuer of the Deed of Trust as Plaintiff's company Endeavor 1 lLC , are inconsistent and irreconcilable.

**iii.** Defendant Customers Bank's Instruction Letter for Disbursement to the Title Company (attached hereto as **Exhibit "16"**) and Defendant Customers Bank Authorization for Disbursement (attached hereto as **Exhibit "17"**) clearly identify the loan recipients (Sellers) as Adagio House II LLC, Adagio House III LLC, and Adagio House I & II PLC.

However, the Closing Information document (attached hereto as **Exhibit "18"**) and the Final Closing Statement (attached hereto as **Exhibit "19"**) show that the loan funds were disbursed to USS Team Investments III LLC.

These four critical Closing documents, all of which are supposed to establish the loan recipients, are inconsistent and contradictory.

**iv.** The Purchase-Sale Agreement in the Closing documents specifies the Real Estate Price as $2,250,000 (attached hereto as **Exhibit "1", page 11**).

However, the Final Closing Statement in the Closing documents lists the Real Estate Price as $2,975,000 (attached hereto as **Exhibit "19"**).

These two critical Closing documents, meant to define the agreed-upon price for the real estate transaction, are directly contradictory and cannot be reconciled.

**In summary**, the above analysis of the Purchase-Sale Agreement, loan, guarantee, Deed of Trust, mortgage documents and closing documents demonstrates that these documents are riddled with contradictions and fail to corroborate one another. These inconsistencies serve as clear evidence that the Purchase-Sale Agreement, loan, guarantee, Deed of Trust, and mortgage documents are not genuine.

**(B).** Identification Verification and Plaintiff's Exclusion from the Closing

The Identification Verification and Notary Certification document in the Closing file (attached hereto as **Exhibit "21"**) clearly lists four individuals involved in the Closing transaction: Kyle Scott, Richard Murray, William Phillips, and Mrs. Mihaela Phillips. Plaintiff was not a participant in this Closing transaction and had no knowledge of its occurrence.

Defendant, in concert with the Title Company, knowingly withheld material information regarding this Closing from Plaintiff. Furthermore, all signatures attributed to Plaintiff on these documents have been confirmed as forgeries through three separate rounds of handwriting analysis conducted by expert examiners (attached hereto as Exhibits **"8", "9", "10"**).

Upon discovering this, Plaintiff identified the matter as a case of identity theft and financial fraud. Plaintiff immediately reported the matter to the State of Illinois, DuPage County, and the Naperville Police Department (attached hereto as **Exhibit "47"**).

## 55. Initiation of Investigations into Identity Theft and Fraudulent Activity

On July 31, 2023, the State of Illinois, DuPage County, Naperville Police Department, and the Illinois Police Department Financial Crimes Unit initiated an investigation into the identity theft case under **case number 9023-000602**.

On August 1, 2023, Plaintiff reported the matter to the United States Small Business Administration (SBA), which initiated a separate investigation and assigned case number ID **0083040002585**.

The case is currently under review by **the United States Secret Service (USSS)** (attached hereto as **Exhibit "47"**).

## 56. Defendant's Unjust Enrichment Totaling $3.4921 Million

Defendant has unjustly enriched itself $3.4921 million through unauthorized deductions and profits from the auction of

Plaintiff's Arizona Properties ： Arizona Properties No.1 and
Arizona Properties No. 2.

Between 2018 and 2022, Defendant, in alleged collusion with
Kyle Scott, exploited forged documentation falsely identifying
Kyle Scott's company "Axcent" as the Operating Manager for
Plaintiff Yang Shao's companies Endeavor 1 LLC and Endeavor
AL LLC. Using this falsified authority, Kyle Scott opened
bank accounts for Endeavor 1 LLC and Endeavor AL LLC at Bank
of America (BOA) in the state of Arizona, designating only
himself and his wife, Mrs. Maxime Scott, as account signers
(attached hereto as **Exhibit "48"**). These accounts were then used
to initiate unauthorized monthly automatic deductions purportedly
as repayments for the fraudulent loan. Despite Plaintiff's
repeated objections, Defendant refused to halt these deductions,
ultimately withdrawing approximately $1.2 million the benefits
and profits from Plaintiff's properties AZ Property No. 1 and AZ
Property No. 2. from Plaintiff's account without authorization.

Plaintiff, nearing the age of 60, invested almost her entire life
savings of $698,475—earned through decades of hard work—to
purchase AZ Property No. 1 and AZ Property No. 2. However, all
the benefits and profits from Plaintiff's properties were
completely taken by Defendant and Kyle Scott through their
collusion. Since making the final payment for the properties on
December 31, 2018, Plaintiff has not received a single dollar in
return. Her life, along with that of her school-aged son, who relied
on her support, fell into extreme hardship. Plaintiff was forced to
work as a janitor to provide for herself and her son, often sleeping
in abandoned restrooms to survive.

In desperation, Plaintiff traveled multiple times to Arizona to demand Deed of AZ Property No. 1 and AZ Property No. 2 from Kyle Scott, only to be met with hostility and ultimately thrown out of his office. Despite Plaintiff's repeated efforts, Kyle Scott disclosed the existence of Defendant's loan for the first time on August 2020. Plaintiff swears that It was not until August 2020 that Kyle Scott informed Plaintiff for the first time about a supposed loan with a bank called Customers Bank, alleging that Plaintiff owed $3.05 million.

This shocking revelation caused Plaintiff severe mental anguish, triggering a relapse of her hereditary depression. On multiple occasions, she attempted suicide but was fortunately saved by her son, who intervened in time. Plaintiff was rushed to the hospital for emergency treatment and later transferred to a psychiatric hospital in Illinois for further care. Although Plaintiff was educated in China, she has been unable to work in the United States due to her limited English proficiency and a hereditary mental illness. Prior to immigrating, Plaintiff had suffered from this mental illness for over 10 years and had been receiving treatment at a psychiatric hospital in Shanghai. Since arriving in the U.S., Plaintiff has not been employed, remaining at home in Illinois to care for household duties and transport her son to and from school. She continues to receive psychiatric medication and has undergone inpatient treatment at Dupage County Hospital in

Illinois.   For this reason, Maricopa County in Illinois once appointed a government official as a guardian for the Plaintiff, Plaintiff was under the guardianship of the Dupage County Public Guardian. (**Exhibit "49"**). However, due to the severity of the Plaintiff's condition, the Plaintiff was forced to return to China in 2023 to undergo nearly a year of psychiatric treatment (**Exhibit "50"**). The Plaintiff was compelled to terminate the bankruptcy case filed on July 9, 2023, in the Northern District of Illinois Bankruptcy Court against Customers Bank   ( **Exhibit "51**).

   As   Kyle Scott and Mrs. Maxime Scott were the sole signers on the Endeavor 1 LLC and Endeavor AL LLC bank accounts, they alone controlled the accounts and executed all purported loan repayment transactions. This further confirms that the actual borrower of the $3.05 million loan was  Kyle Scott, not Plaintiff Yang Shao or her companies Endeavor 1 LLC and Endeavor AL LLC . Between 2018 and 2022, as sole signers of the Endeavor 1 LLC and Endeavor AL LLC bank accounts in, Kyle Scott and Mrs. Maxime Scott enabled Defendant to execute unauthorized monthly deductions amounting to $1.2 million in fraudulent withdrawals. Despite Plaintiff's protests these deductions continued unchecked. Plaintiff Yang Shao or her companies Endeavor 1 LLC and Endeavor AL LLC never entered the phurchase of AZ properties at the price of $ 3.493 million, nor did they borrow $3.05 million from Defendant for phurchase of AZ

properties at the price of $ 3.493 million, nor did they establish or authorize the creation of any bank accounts for Endeavor 1 LLC or Endeavor AL LLC in the state of Arizona, nor did Plaintiff and her companies Endeavor 1 LLC or Endeavor AL LLC acknowledge or repaid any loan in connection with these accounts.

In 2023, Defendant further profited by forcibly auctioning the Arizona Properties (AZ Property No. 1, AZ Property No. 2, and AZ Property No. 3) for $ 3.3135 million, including AZ Property No. 1 and AZ Property No. 2 for $ 2.2491 million which Plaintiff had fully purchased using $698,475 from her own funds. The auction generated Defendant a profit of $3.3135 million, severely infringing upon Plaintiff's property ownership rights. (Attached here as to Exhibit "52"- Exhibit "53").

The plaintiff has **established** that notary Tamara Thompson colluded with defendant Customers Bank on April 2, 2021, and May 25, 2021, to fraudulently obtain duplicate PPP loans through a non-existent entity, with the total amount exceeding $20,000 (Exhibit 68). Of critical significance: the purported corporate borrower **lacked legal standing** at the time of loan disbursement, as its formal incorporation was recorded **11 months post-funding** (Exhibit 69), creating an 11-month gap of **unsubstantiated financial transactions**. This **material temporal inconsistency** demonstrates a potentially illicit financial scheme between Thompson and Customers Bank, thereby **irreparably compromising** the validity of her 2018 notarizations performed for the defendant.

In total, Defendant has unjustly enriched itself by approximately $3.4921 million through its unauthorized actions, including fraudulent deductions $1.2 M and profits $2.2921 million from the forced auction of Plaintiff's Arizona Properties: AZ Property No. 1, AZ Property No. 2.

## CONCLUSION

**57.  Plaintiff who has at all times been the  sole individual to  fully  purchase,  with  her  own funds, the properties at issue in this case—AZ Property No. 1 (4839 E Charleston, Scottsdale, AZ) and AZ**

**Property No. 2 (5328 E Anderson Dr, Scottsdale, AZ).
On December 31, 2018, Plaintiff paid the full
purchase price of $698,475.12 in cash to the previous
owner, USS Team Investments III LLC, thereby
obtaining the complete and exclusive ownership rights
to AZ Property No. 1 and AZ Property No. 2.**

**As the genuine, rightful, sole, and 100% owner
of AZ Property No. 1 and AZ Property No. 2, and with
no other person or entity having ever contributed a
single cent toward the purchase of these properties, no
person or entity other than Plaintiff Yang Shao has
any legitimate claim to being the rightful owner of AZ
Property No. 1 and AZ Property No. 2, nor can anyone
challenge Plaintiff Yang Shao's exclusive and lawful
ownership of these properties.**

**Defendant, through fraudulent means, sought to
recover a $3.05 million loan it had erroneously
disbursed to Plaintiff's previous owner, USS Team
Investments III LLC. These fraudulent actions included
fabricating a real estate purchase agreement, a
fraudulent loan agreement, a fraudulent Deed of Trust,
a fraudulent guarantee agreement, forging Plaintiff's
signature, fabricating real estate valuations, and
deceiving the Small Business Administration (SBA).
Despite there being no legitimate purchase agreement**

involving Plaintiff or her company for the Arizona real estate at $3.495 million, Defendant falsely accused Plaintiff before this Honorable Court on January 17, 2023. Defendant claimed Plaintiff had borrowed $3.05 million under her company's name to purchase the Arizona real estate, instead of pursuing USS Team Investments III LLC, which was the actual loan recipient.

On October 24, 2023, Defendant unlawfully forced the auction of AZ Property No. 1 and AZ Property No. 2, which Plaintiff had fully purchased on December 31, 2018, with $698,475.12 in cash. These actions resulted in the illegal seizure of Plaintiff's two Arizona properties, leading to Defendant's unjust enrichment amounting to $3.4921 million, significant financial harm to Plaintiff, and severe damage to her mental health, exacerbating her hereditary panic disorder.

Under Arizona criminal law, Plaintiff Yang Shao, under oath, declares that she has never participated in the fraudulent real estate purchase agreement at the heart of this case, nor in the resulting fraudulent loan agreement, Deed of Trust, or guarantee agreement.

**58.  Plaintiff is a Victim of Financial Fraud, Identity Theft, and Forgery.**

 Plaintiff Yang Shao has been subjected to a series of fraudulent activities, identity theft, and forgery orchestrated by Defendant Customers Bank and its internal collaborators, including Karl Danielian (Senior Vice President of the Defendant) and Kyle Scott. Between 2018 and 2023, these parties engaged in fraudulent schemes with the aim of generating illicit profit.

**1). Defendant Customers Bank initially relied on false $3.495 million Arizona real estate purchase agreements (**attached hereto as **Exhibit "1" and "2")** without proper verification. Subsequently, Defendant, for financial gain, employed forged documents and deceptive methods, falsified property appraisals, and fabricated Plaintiff's involvement in fraudulent loan agreements and guarantees. These fraudulent actions were designed to secure SBA approval for a $3.05 million loan and related guarantees.

**2). As a direct result of these fraudulent schemes, Defendant unjustly deprived Plaintiff's Arizona real estate ( AZ property No. 1 and AZ property No. 2)** valued at $2.2921 million and net profits of $1.2 million generated by those properties, resulting in unjust enrichment totaling $3.4921 million. Furthermore, Defendant's actions caused significant financial harm and severe damage to Plaintiff's mental and severe damage to Plaintiff's mental health, exacerbating her hereditary panic disorder.

**3). Defendant's fraudulent conduct includes, but is not limited to:**

•  **Relying on false $3.495 million Arizona real estate purchase agreements from the beginning :** Defendant relied on fraudulent Arizona real estate purchase agreements, such as those involving Adagio Houses as sellers—entities that were not the rightful owners of the Arizona Properties listed in the agreements. The fraudulent agreements were executed between  Kyle Scott's company, Endeavor US LLC, and the fictitious entities, Adagio Houses. These agreements have no connection to Plaintiff Yang Shao or her companies, Endeavor 1 LLC and Endeavor AL LLC (attached hereto as **Exhibit "1" and "2").**

•  **To generate profit, Defendant fabricated a Loan Commitment Letter:** Defendant fabricated a loan commitment letter to initiate the fraudulent scheme (attached hereto as **Exhibit "3").**

•  **To generate profit, the Defendant fabricated fraudulent loan agreements involving the Plaintiff's companies, Endeavor 1 LLC and Endeavor AL LLC, for a fictitious $3.05 million loan.** It is well-established that real estate purchase agreements are the prerequisite and foundation for loan agreements. However, the Plaintiff's companies, Endeavor 1 LLC and Endeavor AL LLC, have never entered into any $3.495 million Arizona real estate purchase agreements with any individual or entity.

The Defendant's allegation that Endeavor 1 LLC and Endeavor AL LLC borrowed $3.05 million from the Defendant to purchase $3.495 million worth of Arizona real estate is entirely baseless, lacking any factual foundation or credible source (attached hereto as **Exhibits "1" and "2").**

Furthermore, the Defendant created fraudulent loan documents, including, but not limited to, a Note containing inconsistencies across multiple versions (attached hereto as **Exhibits "4"–"5"),** as confirmed by expert analyses (attached hereto **as Exhibits "8"– "10").**

• **To generate profit, Defendant created Fraudulent Guarantee Documents**. To generate profit, the Defendant created fraudulent guarantee documents. These include, but are not limited to, mortgage documents with inconsistencies across multiple versions (attached hereto as **Exhibits "6"** and **"7"),** as confirmed by expert analyses (attached hereto as **Exhibits "8"–"10").**

• **To generate profit, the Defendant inflated the 2018 appraised value of the Arizona Properties to $3.09 million, despite their actual market value being under $1.5837 million.** The Defendant falsified these appraisals to secure SBA approval for a $3.05 million loan and related guarantees (attached hereto as **Exhibits "11" and "12").** Defendant's overvaluation of the Arizona Properties—falsely appraising them at $3.09 million in 2018 while their actual market value was less than $1.5837 million

(attached hereto as **Exhibits "11," Pages 20/6a, 6b, 6c, and Exhibit "12")**—misrepresented their true worth and deceived the SBA into approving the loan.

- **To generate profit, the Defendant forged the Plaintiff's signature:** Defendant forged the Plaintiff's signature on the SBA 7(a) Borrower Information Form – Representations, Authorizations, and Certifications (attached hereto as **Exhibit "13," Page 2, and Page 6).**

Plaintiff's signature on **Exhibit "13," Page 2,** appears on the SBA 7(a) Borrower Information Form dated August 29, 2018. However, the same signature also appears on **Exhibit "13," Page 6**, which is a sales contract for a piece of land sold by the Plaintiff in Naperville, Illinois, dated July 3, 2017. These signatures on **Exhibit "13," Page 2 and Page 6**, are identical.

It is impossible for the Plaintiff to have signed the same signature on two entirely different documents, one dated July 3, 2017, and the other over a year later on August 29, 2018, as it is not feasible for a person to produce two identical signatures on separate occasions. The Plaintiff's signature on **Exhibit "13," Page 2**, was clearly copied from the Plaintiff's signature on **Exhibit "13," Page 6**, and was unlawfully copy, cut and pasted by Defendant onto the SBA 7(a) Borrower Information Form.

This forged signature on the SBA 7(a) Borrower Information Form dated August 29, 2018, was fabricated by the Defendant through illegal means to deceive the SBA and falsely implicate the

Plaintiff as a guarantor for the fictitious $3.05 million loan (attached hereto as **Exhibit "13" Page 2, and Page 6).**

•   **To generate Profit, Defendant Falsified Notarial Records**

The notarial records submitted to the court are falsified. Plaintiff, under penalty of perjury pursuant to Arizona criminal law, affirms that prior to July 19, 2023, they had never met the notary in question nor had any interactions with them. The records lack a specific notarization time, and the stated notarization location, "**735 Executive Dr, Aurora, IL,**" does not exist. A Google Maps search for this address yielded no results, and Plaintiff personally drove along Executive Dr in Aurora, IL, but found no such location (attached here to as **Exhibit "14").** Furthermore, multiple handwriting examinations confirmed that Plaintiff's signature on the notarial records was forged (attached hereto as **Exhibits "8"–"10").**

•   **To generate profit, Defendant withheld Critical Information:**

Defendant intentionally withheld critical documents and information, including but not limited to: the SBA Loan Authorization, loan-related details, guarantee-related details, and failed to disclose key discrepancies in the Closing documents. These discrepancies include contradictions in the identities of the buyer, seller, and loan applicant, among others (attached hereto as **Exhibits "1", "2", "3", "4", "5", "6", "7", "11", "12", "13", "14", "15", "16", "17", "18", "19", "20", "21", "22"**).

**59. The Defendant failed to perform its duty of due diligence by neglecting to verify the authenticity of the loan documents, the Deed of Trust, and guarantees.** The Defendant neither confirmed the Plaintiff's identity nor obtained her explicit consent for the transactions in question. Furthermore, the Defendant did not inform the Plaintiff about the loans, guarantees, Deed of Trust, or mortgage-related matters until four years after the closing, on August 11, 2022, for the first time (attached hereto as **Exhibits "22")**.

**60.     The Defendant's actions constitute gross negligence, fraud, and breach of fiduciary duty.** The Defendant knowingly engaged in fraudulent activities, including relying on false purchase agreements, such as those involving the Adagio House entities as sellers, who were not the actual owners of the properties listed in the sales contracts (attached hereto **as Exhibits "1" and "2")**. This fraudulent purchase agreement was entirely unknown to Plaintiff Yang Shao and her companies, Endeavor 1 LLC and Endeavor AL LLC. Furthermore, neither Plaintiff Yang Shao nor her companies were involved in or consented to this purchase agreement. They have no connection whatsoever to the agreement or the fraudulent transactions arising from it.

**61. The Plaintiff has suffered substantial financial losses and emotional distress directly caused by the Defendant's actions.** The Defendant has unjustly enriched itself by approximately $3.4921 million through unauthorized deductions and profits from

the auction of the Plaintiff's Arizona Properties (**Arizona Property No. 1 and  Arizona Property  No. 2**).


• Unauthorized monthly deductions from the output of Plaintiff's Arizona Properties (**Arizona Property No. 1 and No. 2**), totaling $1.2 million between 2018 and 2022.

• Illegally and forcibly auctioning Plaintiff's Arizona Properties (**Arizona Property No. 1 and No. 2**) in 2023, from which the Defendant improperly profited $2.2921 million.

• Irreparable harm to the Plaintiff's mental health, as well as personal and professional reputation, compounded by ongoing legal battles and foreclosure risks.


**62. The Plaintiff seeks compensatory and punitive damages, as well as any other relief the Court deems appropriate.** The Defendant's egregious conduct warrants severe
penalties to deter similar fraudulent activities in the future.

**63. The Plaintiff requests the Court to order the judicial authorities to initiate a comprehensive investigation into the Defendant's past loan operations and auction of mortgaged properties, in order to protect vulnerable consumers who have had similar harmful experiences as the Plaintiff.**


## <u>EVIDENTIARY BASIS</u>

**64. Fraudulent misrepresentation through fabricated documents and forged signatures** (attached hereto as **Exhibit "8", "9","10","13", "23"** ).
.

**65. Failure to perform basic due diligence, such as verifying county land records** (attached hereto as **Exhibits "1", "2", "3", "4", "5", "6", "7", "11", "12", "13", "14", "15", "16", "17", "18", "19", "20", "21", "22"**).

**66. Gross overvaluation of collateral to deceive the SBA to secure fraudulent loan approval** (attached hereto as **Exhibit "11" and "12"**).

**67. Unauthorized use of the Plaintiff's personal information and forged signatures, as confirmed by expert analysis** (attached hereto as **Exhibit "8", "9","10","13", "23"** ).

**68. The Plaintiff respectfully pleas that the Court recognize the Defendant's gross misconduct, hold the Defendant accountable, and grant relief commensurate with the financial and emotional harm suffered by the Plaintiff.**

# Legal Basis

## 69. Fifth Amendment to the United States Constitution**

The Fifth Amendment protects Plaintiff's private property rights by ensuring that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Defendant's actions unlawfully deprived Plaintiff of her property without due process and without any compensation.

## 70. Fourteenth Amendment to the United States Constitution**

The Fourteenth Amendment ment extends the Fifth Amendment's protections to state actions, ensuring that "no state shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.", Defendant's actions, facilitated by the Title Company's errors, violated these constitutional protections.

## 71. Arizona State Constitution**

Pennsylvania's Constitution further safeguards private property rights and ensures that any deprivation of property follows strict legal procedures and compensatory measures.

## 72. Related Protections

The constitutional guarantees against unlawful seizures and the protections of private property in the Third ment indirectly reinforce Plaintiff's rights to maintain exclusive ownership of her lawfully purchased properties.

## CLAIMS FOR RELIEF

### 73. Monetary Damages:

The Plaintiff respectfully pleas that the Court award:

• Compensatory Damages: To compensate the Plaintiff for financial and emotional losses caused by the Defendant's actions, in
an amount to be determined at trial.
• Punitive Damages: To punish the Defendant for egregious and fraudulent conduct and to deter similar behavior in the future.

### 74. Declaratory Relief:

The Plaintiff prays that the Court declare the Defendant's actions, including the fraudulent loan, guarantee, and mortgage agreements, as illegal, void, or unenforceable under applicable law.

### 75. Injunctive Relief:

The Plaintiff requests that the Court issue an injunction to:

• Prevent the Defendant from enforcing the fraudulent loan, guarantee, and mortgage agreements.

• Halt any ongoing or future collection actions related to these fraudulent agreements.

## 76. Attorney's Fees and Costs:

The Plaintiff respectfully requests the Court to award reasonable attorney's fees and costs incurred in defending against the Defendant's claims and pursuing this complaint.

**77. Plaintiff respectfully requests that the Honorable Court to issue an Order initiating a regulatory investigation into all of Defendant's loan and auction transactions since its inception. This investigation aims to assist vulnerable individuals who, like the Plaintiff, have suffered harm due to Defendant's fraudulent practices.**

## 78. Other Relief:

The Plaintiff prays for any additional relief the Court may deem just and proper under the circumstances.

**Attachment: Compliance Issues Regarding Defendant**

**RESPECTFULLY SUBMITTED** this 22 day May, 2025.

/s/ Yang Shao

YANG SHAO

YANG SHAO
524 E 14TH AVE
NAPERVILLE  IL
60563
shaoyang_suny@163.com
Defendant

**ORIGINAL** of the foregoing e-filed
this 22 day of May, 2025, with:

Clerk of the Court–United States District Court for the Eastern District of Pennsylvania

/s/ Yang Shao

YANG SHAO

4